# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-10883

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

LENDELL BEACHAM; WILLIAM RANDOLPH TISDALE, JR.,

Defendants–Appellants.

Cons. w/ No. 12-11209

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

HUBERT JONES, III,

Defendant–Appellant.

Appeals from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and BENAVIDES and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

United States Court of Appeals
Fifth Circuit

**FILED**

December 12, 2014

Lyle W. Cayce
Clerk

No. 12-10883

William Tisdale, Hubert Jones, and Lendell Beacham were convicted by a jury on various counts of conspiracy, wire fraud, and bank fraud. They appeal the sufficiency of the evidence supporting their respective convictions, various aspects of their respective prison sentences, and the district court's method of calculating restitution. We affirm their convictions but vacate their sentences and remand for resentencing.

**I**

In 2002, William Tisdale and former Dallas Cowboy Eugene Lockhart formed America's Team Mortgage (ATM) and KLT Realty (KLT). The evidence at trial indicated that Tisdale and Lockhart devised a "pass-through" real estate scheme. ATM/KLT would contract to purchase a property and, before obtaining title to the property, would almost immediately sell it to "straw" purchasers at a higher price. The straw buyers were individuals with good credit, who relied in part on the cachet of Lockhart's celebrity. ATM/KLT told these individuals that they would be buying properties as a once-in-a-lifetime investment opportunity. ATM/KLT provided the mortgage down payments and paid the straw buyers a bonus of up to $20,000 for each investment property he or she purchased. ATM/KLT also represented to the buyers that they were connected with individuals who desired to own property but needed to improve their credit scores. These individuals, ATM/KLT said, would rent the properties from the buyers, and the rental income would cover the monthly mortgage payments. Ostensibly, the renters would thereby improve their credit scores, and in time, be able to obtain a mortgage loan to purchase the properties from the straw buyers. However, ATM/KLT did not obtain renters, so there was no revenue generated for the straw buyers, and those buyers defaulted on the mortgages. The lenders foreclosed on the properties. ATM/KLT, however, profited.

No. 12-10883

In order to convince lenders to issue mortgages to the straw buyers, Tisdale, Lockhart, and others falsified loan documents, procured inflated property appraisals, and convinced the straw buyers to make misrepresentations in their mortgage applications. When the lender funded a loan to the straw buyer, the purchase price was paid to ATM/KLT, the original property owner was then paid the lower purchase price by ATM/KLT, and ATM/KLT kept the difference.

In late 2003, Tisdale and Lockhart dissolved their business association, and each formed new companies. Tisdale and Hubert "Trey" Jones, III, organized Atilla Capital and Pinnacle Realty, while Lockhart and Jermaine Frazier created Cowboys Mortgage. Atilla, Pinnacle, and Cowboys Mortgage continued the real estate pass-through scheme utilized by ATM/KLT.

In order to effectuate the scheme, Tisdale's and Lockhart's companies enlisted the participation of, and sometimes paid, members of the real estate industry to assist in the procurement of the loans. Lendell Beacham was among them. Occasionally, before approving a loan, a lender required the submission of a verification-of-rent form (VOR) to determine whether the borrower qualified. The VOR reflected the borrower's history of making monthly rental payments and therefore was an indication of the ability to make the monthly mortgage payments. Beacham, a licensed realtor and a landlord, provided VORs with falsified information at the request of Tisdale, Frazier, and Lockhart.

In 2009, Tisdale, Jones, and Beacham, along with eight co-defendants, were indicted on charges of conspiracy, bank fraud, and wire fraud. Lockhart and five other co-defendants pleaded guilty. Tisdale, Jones, Beacham and two others proceeded to trial. The jury found Tisdale, Jones, and Beacham guilty of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Additionally, the jury convicted Tisdale and Jones of aiding and abetting bank

3

No. 12-10883

fraud under 18 U.S.C. § 1344 and convicted both Beacham and Jones on separate counts of aiding and abetting wire fraud under 18 U.S.C. § 1343. Tisdale, Jones, and Beacham were each sentenced to serve a term of imprisonment.

The district court also ordered Tisdale, Jones, and Beacham to each pay restitution to the victims of the fraud.  To calculate the amount of restitution, the district court reduced the original loan amount by any proceeds obtained through foreclosure.  However, Tisdale, Jones, and Beacham objected to the use of the original loan amount for victims that purchased the loans on the secondary market.  Without evidence of the mortgages' purchase prices on the secondary market, the district court used the original loan amounts as a "reasonable estimate" of the amount owed in restitution.  These appeals followed.

## II

Tisdale, Jones, and Beacham each challenge the sufficiency of the evidence supporting their respective convictions, except Jones does not challenge his separate conviction for bank fraud.  Because they made timely motions for judgments of acquittal, we review the sufficiency of the evidence *de novo*.[1]  However, "[o]ur review of the sufficiency of the evidence is highly deferential to the verdict."[2]  The jury's verdict will be affirmed unless no "rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt.  In reviewing the evidence presented at trial, we draw all reasonable inferences in favor of the jury's verdict."[3]

---

[1] *United States v. Block*, 635 F.3d 721, 723 (5th Cir. 2011) (per curiam).

[2] *United States v. Isgar*, 739 F.3d 829, 835 (5th Cir. 2014) (internal quotation marks and citations omitted).

[3] *United States v. Miles*, 360 F.3d 472, 476-77 (5th Cir. 2004) (citations omitted).

No. 12-10883

## A

Tisdale, Jones, and Beacham were each convicted of conspiracy to commit wire fraud under 18 U.S.C. § 1349. To be convicted of conspiracy under § 1349, the jury must find: (1) two or more persons agreed to commit fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined the agreement with the intent to further the unlawful purpose.[4] "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances."[5]

Tisdale and Jones challenge their convictions by asserting that the government failed to establish that they "agreed" to engage in real estate fraud. However, the government provided ample evidence to the jury to support the convictions.

For example, Lockhart testified that Tisdale was the "great teacher" at ATM/KLT and instructed his co-conspirators on how the pass-through scheme operated. Lockhart described Tisdale as the point-person for the conspiracy: Tisdale directed how funds were to be disbursed after each fraudulent transaction and how much of a bonus the straw buyers should receive. The testimony of Stacey Chambers-Ball, an office manager at ATM/KLT, corroborated Tisdale's role in the conspiracy. She testified that Tisdale was "the most savvy," he held the pass-through scheme out as his formula, and other employees would seek his assistance. Jacqueline Hawthorne and Wilma Holliday, both straw buyers, testified that they met with Tisdale and became investors relying on his misrepresentations.

---

[4] *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012).

[5] *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014) (quoting *Grant*, 683 F.3d at 643).

No. 12-10883

Jones joined ATM shortly before that company dissolved, and he and Tisdale formed Atilla/Pinnacle. Chambers-Ball testified that Jones was certainly aware of the pass-through scheme in his short time at ATM. Several victims of the conspiracy also testified as to Jones's involvement. Samuel Washington, a straw buyer, testified that Jones was the first to present him with the idea of being an investor. Holliday testified that Jones assisted Tisdale in the initial meeting at ATM about an investment opportunity. After ATM dissolved, Jones remained involved in the Hollidays' transaction at Pinnacle.

The strength of the evidence against Tisdale and Jones shows that a rational jury could have found them guilty of conspiracy. But, Tisdale and Jones alternatively assert that even if there was evidence that they engaged in a conspiracy, it was not the conspiracy alleged in the indictment. Specifically, they argue that the conspiracy proved at trial was specific to Cowboys Realty, Lockhart's company after Tisdale and Lockhart ended their business relationship.

The question of whether the evidence establishes the existence of a single conspiracy or multiple conspiracies is a question of fact for the jury, and "[w]e will affirm the jury's finding that the government proved a single conspiracy 'unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt.'"[6] "The principal considerations in counting the number of conspiracies are (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the

---

[6] *Id.* at 548 (quoting *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007)).

various dealings."[7] The evidence presented at trial supports the jury's verdict under all three factors.

First, we have applied the criteria for a common goal broadly, such that the "test may have become a matter of semantics."[8] For example, in *United States v. Richerson*, we concluded that a common goal was shown when alleged co-conspirators all sought "personal gains" through some participation in a broad conspiracy scheme.[9] Similarly, in *United States v. Mitchell*, we held the jury could have found a common goal of deriving "personal gain from the sale of crack cocaine."[10] Likewise, there was ample evidence for the jury to reasonably conclude Tisdale, Jones, and other co-conspirators shared the common goal of deriving personal gain through real estate fraud.

Second, in considering the nature of the scheme, a single conspiracy "will be inferred where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture."[11] The evidence establishes that the jury could reasonably conclude that the nature of the scheme also indicated a single conspiracy. Two straw buyers testified that they began their transactions with ATM/KLT, and after Tisdale and Lockhart were no longer associated, one of the buyers closed with Cowboys Realty, which was Lockhart and Frazier's company, and the other buyer closed with Atilla/Pinnacle, which were Tisdale and Jones's companies. Another straw buyer testified that Jones gave her a Lockhart-autographed football upon closing, even though her transaction occurred after Jones and

---

[7] *Mitchell*, 484 F.3d at 770 (quoting *United States v. Morrow*, 177 F.3d 272, 291 (5th Cir. 1999)).

[8] *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987).

[9] *Id.*

[10] *Mitchell*, 484 F.3d at 770.

[11] *Id.* (quoting *United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995)).

Tisdale had formed Atilla/Pinnacle.    Holliday, who was presented the investment opportunity at ATM/KLT and later at Atilla/Pinnacle, testified that the schemes presented to her were identical.

Third, in considering the overlapping of participants, "there is no requirement that every member must participate in every transaction to find a single conspiracy."[12] "The more interconnected the various relationships are, the more likely there is a single conspiracy."[13]   The evidence established sufficient overlap between the conspiring parties to allow the jury to reasonably conclude there was a single conspiracy.  Testimony from several government witnesses established that the pass-through scheme initiated at ATM/KLT with Tisdale and Lockhart.  After Tisdale and Lockhart ended their association, they both formed new companies with employees from ATM/KLT and continued to perpetuate the fraud.

The district court instructed the jury that if it found that a defendant was in a conspiracy but not in the conspiracy alleged in the indictment, then it must acquit.  But the jury found a single conspiracy.  Construing the evidence in the light most favorable to the verdict, we conclude that a reasonable jury could have found a single conspiracy beyond a reasonable doubt.  We therefore affirm Tisdale's and Jones's conspiracy convictions.

**B**

Beacham also challenges the sufficiency of the evidence of his conspiracy conviction, but on separate grounds.  Beacham asserts that his conviction cannot stand because it is based primarily on the testimony of Lockhart and Frazier, who Beacham asserts are not credible witnesses.  But this court's "role

---

[12] *Id.* (quoting *Morris*, 46 F.3d at 416).

[13] *Id.* (quoting *Morris*, 46 F.3d at 416).

No. 12-10883

does not extend to . . . assessing the credibility of witnesses."[14]  We cannot nullify the jury's verdict based on the assertion that the testimony offered at trial was not credible.

## C

Tisdale and Jones challenge the sufficiency of the evidence supporting their convictions for aiding and abetting bank fraud in violation of 18 U.S.C. § 1344[15] in relation to the sale of 716 Mustang Ridge Drive to the Hollidays. Because Tisdale and Jones were charged with aiding and abetting, it was not necessary for the government to prove that Tisdale and Jones themselves completed all the elements of the underlying crime.[16]  It was sufficient to show that they "associated with the criminal venture such that [they] had the same criminal intent as the principal."[17]  Tisdale and Jones accordingly challenge their convictions by arguing there was insufficient evidence to establish they acted with the requisite intent.  However, the testimony of Tricia Suarez and Wilma Holliday provided sufficient evidence of intent.

---

[14] *United States v. Reagan*, 725 F.3d 471, 481 (5th Cir. 2013) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)).

[15] 18 U.S.C. § 1344 provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

[16] *United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996).

[17] *Id.*

9

No. 12-10883

Suarez was the escrow agent for the sale of 716 Mustang Ridge, and she pled guilty prior to trial. Suarez testified that the sale contracts submitted to her by Pinnacle, which was Tisdale and Jones's company, contained fraudulent information. The documents also contained forgeries of the Hollidays' signatures. Countrywide, the lender, issued a loan to the Hollidays based on these fraudulent documents.

Holliday testified that Tisdale and Jones presented the idea of investing in 716 Mustang Ridge. Tisdale and Jones characterized the transaction as a once-in-a-lifetime investment opportunity. Additionally, the jury could have inferred Tisdale's and Jones's intents to further the fraudulent scheme because the details of the Hollidays' purchase of 716 Mustang Drive followed the pattern of the pass-through scheme.

Reviewing the evidence in the light most favorable to the verdict, a rational jury could have found Tisdale and Jones guilty of aiding and abetting bank fraud beyond a reasonable doubt.

**D**

Beacham challenges the sufficiency of the evidence supporting his conviction under 18 U.S.C. § 1343[18] for aiding and abetting wire fraud relating to the purchase and sale of 1206 Quinlan Drive to Nicholas Mazzu, a straw

---

[18] 18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

buyer.    As discussed above, "[t]o aid and abet simply means to assist the perpetrator of a crime while sharing the requisite criminal intent."[19]

Beacham argues that the evidence presented at trial did not establish his specific intent to aid and abet wire fraud because he believed the transaction to be legal and he thus acted in good faith.    However, the government presented the jury with evidence sufficient to support Beacham's conviction.

Although Beacham's usual role in the conspiracy was to provide false VORs that would be submitted to lenders, Beacham facilitated the pass-through for the 1206 Quinlan transaction.    Although Beacham claims in his brief that he believed the transaction to be legal, testimony at trial revealed that Beacham told Lockhart he was uncomfortable with acting as the middleman for pass-through transactions.    Despite his discomfort, he persisted and was paid $10,000 to $15,000 per transaction.

In addition to conducting the transaction as a pass-through, Beacham's intent was further established by the several misrepresentations made in the straw buyer's loan application.    For example, the evidence indicated Beacham inflated Mazzu's income, falsely stated the Quinlan Drive property would be Mazzu's primary residence, and forged Mazzu's signature.

Considering the evidence in the light most favorable to the verdict, the government presented evidence at trial from which a rational jury could find Beacham guilty of aiding and abetting wire fraud.

### III

The district court sentenced Tisdale, Jones, and Beacham to each serve a term of imprisonment.    Tisdale and Beacham, but not Jones, challenge their

---

[19] *Ismoila*, 100 F.3d at 387 (quoting *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995)).

sentences.  "We review sentences for reasonableness under an abuse of discretion standard.  First, we determine whether the district court committed any procedural error, such as improperly calculating the Guidelines range.  If there is no procedural error or the error is harmless, we may review the substantive reasonableness of the sentence."[20]  When an appellant objects to sentence enhancements before the district court, "we review the district court's interpretation and application of the Guidelines de novo, and review findings of fact for clear error."[21]  "Under the clearly erroneous standard, we will uphold a finding so long as it is plausible in light of the record as a whole."[22]

## A

The district court sentenced Tisdale to a term of 120 months after calculating Tisdale's advisory sentencing range to be 151 to 188 months under the Guidelines.  This calculation included enhancements for (1) the number of victims, (2) the sophistication of the offense, (3) Tisdale's role as the leader/organizer of a crime that involved five or more participants, and (4) committing the offense while on probation.  Tisdale objected to each sentence enhancement to the district court.  Because the bases for Tisdale's sentence enhancements amounted to factual findings, we review the district court's determinations for clear error.

First, Tisdale asserts that the district court could not enhance his sentence for having ten or more victims pursuant to USSG § 2B1.1(b)(2)(A)(i) because it is unclear who the ten victims were.  However, during Tisdale's sentencing hearing, the district court heard evidence establishing that there

---

[20] *United States v. Valdez*, 726 F.3d 684, 692 (5th Cir. 2013) (citations omitted) (citing *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008)).

[21] *Id* (citing *Cisneros-Gutierrez*, 517 F.3d at 764).

[22] *United States v. Ramos-Delgado*, 763 F.3d 398, 400 (5th Cir. 2014) (quoting *United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009)).

were at least ten victims of his fraud. While Tisdale asserts that many of the victim banks were "double counted," it is apparent that banks counted twice were counted once as a victim, and again as a trustee for another entity. When the bank is acting as a trustee, the real victim is not the bank, but the beneficiary of the trust. Therefore, the district court did not clearly err in finding ten or more victims and imposing this sentence enhancement.

Second, the district court imposed an enhancement under USSG § 2B1.1(b)(10)(C) because Tisdale's fraud used sophisticated means. In *United States v. Chon*, we affirmed a sophisticated-means enhancement in connection with a money-laundering conviction because the defendant maintained two sets of financial records, skimmed income daily, and mislabeled funds to disguise their source.[23] The mortgage-fraud scheme at issue here is arguably more complex than the operations in *Chon*. The district court noted the various elements supporting its finding of sophistication: for example, the different levels of people engaged in the fraud, the recruiting of the straw buyers, the use of false VORs, the involvement of escrow officers, and the length of time the scheme continued. The district court's determination that Tisdale used sophisticated means is plausible in light of the record as a whole, and therefore, the district court did not clearly err in applying the enhancement.

Third, the district court increased Tisdale's offense level pursuant to § 3B1.1(a) of the sentencing guidelines, because the court determined Tisdale was the leader or organizer of the mortgage-fraud scheme and the scheme involved five or more participants. Tisdale's Presentence Report (PSR) identified Frazier and Suarez as co-participants, and the district court, during the sentencing hearing, identified Lockhart and Jones as well. Tisdale himself

---

[23] *United States v. Chon*, 713 F.3d 812, 822-23 (5th Cir. 2013).

No. 12-10883

may be counted as a co-participant,[24] thus bringing the total participants to a minimum of five.  The record also supports the district court's finding that Tisdale was a leader of the conspiracy.  Lockhart testified that Tisdale was the "great teacher" at ATM/KLT because Tisdale was the most knowledgeable about the real estate business and taught his co-conspirators how the mortgage-fraud scheme would operate.  The district court expressed, based on all the evidence that had been presented at trial and the sentencing hearings, that Tisdale "was clearly the leader of this organization."  We do not disturb this finding nor the imposition of the sentence enhancement.

Finally, the district court increased Tisdale's criminal history by two points because the fraud began while Tisdale was on probation.  Tisdale was on probation from May 2, 2002 until April 30, 2003.  Tisdale and Lockhart formed ATM and KLT in August 2002.  These two companies were found to be the initial vehicle for the mortgage-fraud conspiracy.  Lockhart testified that Tisdale began teaching him about the pass-through scheme shortly after their businesses were organized.  The district court's finding is plausible in light of the record as a whole, and the court did not clearly err by finding Tisdale was on probation when the offense began.

**B**

The district court sentenced Beacham to a term of thirty-six months of imprisonment after calculating his advisory guidelines range to be forty-six to fifty-seven months.  Beacham challenges his sentence because the district court denied him a minor-role reduction, and he claims the district court improperly calculated the relevant loss amount.  Because both the scope of Beacham's role and the loss amount are factual findings, we review for clear error.

---

[24] *See United States v. Wilder*, 15 F.3d 1292, 1299 (5th Cir. 1994).

14

No. 12-10883

Beacham asserts that his involvement in the conspiracy was limited to the 1206 Quinlan transaction and he was thus entitled to the minor-role reduction. He also asserts that the loss amount the district court assigned to him was incorrect because it included the losses from properties for which Beacham did not provide or authorize false VORs. These losses, Beacham contends, should not be included because the VORs were forged by Frazier and because the lenders did not rely on the VORs. Beacham's assertions are not supported by the record. Both Lockhart and Frazier testified that Beacham prepared fraudulent VORs and authorized Frazier to sign fraudulent VORs in Beacham's absences. One VOR was incomplete, and Beacham contends that no one could have relied upon it. But this VOR had information that purported to represent rental history, and there was no evidence that the VOR was disregarded or ignored by the lender. Testimony at trial established that, as a general matter, VORs could play a pivotal part in a lender's decision to issue a loan. The district court did not clearly err by denying Beacham the minor-role reduction or including properties other than 1206 Quinlan Drive in the loss amount attributable to Beacham.

## IV

The district court ordered Tisdale, Jones, and Beacham to each pay an amount in restitution pursuant to the Mandatory Victims Restitution Act (MVRA).[25] The victims to whom restitution is to be paid are financial institutions that eventually foreclosed on the fraudulently procured mortgages. For several transactions at issue, the victim financial institution was not the original lender. The district court did not have before it evidence

---

[25] 18 U.S.C. § 3663A(a)(1) ("Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense . . . .").

15

No. 12-10883

of these victims' purchase prices for the mortgages on the secondary market and could not calculate the exact losses these victims suffered.  Instead of ordering no restitution, the district court calculated the restitution amount by subtracting the victims' foreclosure proceeds from the original loan amounts.

## A

We review "the legality of a restitution order de novo and the amount of the restitution order for an abuse of discretion."[26]  The district court "abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[27]

The defendants contend that the loss amount for a victim who purchased a mortgage on the secondary market cannot be based on the amount of the original loan.  We recently addressed this identical issue in an appeal by Tisdale, Jones, and Beacham's co-defendant, Jermaine Frazier, who pleaded guilty prior to trial.[28]  In an unpublished opinion, we agreed with the disposition of the issue by our sister circuits and held that the original loan amount is irrelevant to determining loss when a victim purchased a mortgage on the secondary market.[29]  In *United States v. Yeung*, the Ninth Circuit reasoned:

> Because the value of that loan is not necessarily its unpaid
> principal balance, but may vary with the value of the collateral,
> the credit rating of the borrower, market conditions, or other

---

[26] *United States v. Arledge*, 553 F.3d 881, 897 (5th Cir. 2008) (citing *United States v. Adams*, 363 F.3d 363, 365 (5th Cir. 2004)).

[27] *United States v. Crawley*, 533 F.3d 349, 358 (5th Cir. 2008) (internal quotation marks and citations omitted).

[28] *United States v. Frazier*, 577 F. App'x 271, 271-72 (5th Cir. 2014).

[29] *Id.* at 273-74.

factors, the loan purchaser may have purchased the loan for less
than its unpaid principal balance.[30]

In *United States v. Chaika*, the Eight Circuit commented that the loss to a
victim who is not the initial lender "will turn on its purchase price in the
secondary market."[31]  Therefore, the proper amount of restitution owed to a
victim that purchased a fraudulently procured loan on the secondary market
is what the victim paid for the mortgage less any proceeds obtained through
foreclosure.

The government attempts to distinguish *Yeung* and *Chaika* by noting
that in those cases, unlike here, the secondary-market purchase prices were
available.  The unavailability of the information in this case, the government
argues, forced the district court to choose between awarding no restitution and
awarding the victims restitution based on the original loan amounts.  However,
our court has held that "[t]he MVRA limits restitution to the actual loss
directly and proximately caused by the defendant's offense of
conviction. . . .  [E]xcessive restitution awards cannot be excused by harmless
error; every dollar must be supported by record evidence."[32]  In *United States
v. Arledge*, less than one percent of the total order was not supported by the
record, but we vacated the restitution order.[33]  The purchase prices paid by
many of the victims who were not the original lenders are not in the record.
The government has not carried its burden of establishing the restitution
amount as it pertains to the secondary-market purchasers.[34]  Accordingly, the

---

[30] *United States v. Yeung*, 672 F.3d 594, 602 (9th Cir. 2012), *abrogated on other grounds by Robers v. United States*, 134 S. Ct. 1854 (2014).

[31] *United States v. Chaika*, 695 F.3d 741, 748 (8th Cir. 2012).

[32] *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012).

[33] *United States v. Arledge*, 553 F.3d 881, 899 (5th Cir. 2008).

[34] 18 U.S.C. § 3664(e) ("The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government.").

district court abused its discretion by using the original loan amounts to calculate restitution for these victims. The restitution orders must be vacated.

**B**

The question arises as to whether we may vacate and remand only the restitution aspects of the sentences. "Our court has in some cases vacated the entire sentence when an order of restitution was vacated, but in other cases, our court has vacated only the restitution order and left in place a term of imprisonment that was also included in the sentence."[35] We have vacated an entire sentence after determining there was an error in a restitution award when restitution was "only one component of the sentencing court's balance of sanctions."[36] In the present case, it is unclear whether the district court weighed the restitution awards in the balance when deciding Tisdale's, Jones's, and Beacham's prison terms. The district court did not, on the record, state whether the imposition of restitution resulted in a modification of the prison sentences or its decision not to impose penal fines. We therefore vacate the sentences in their entirety and remand for resentencing.

\*    \*    \*

For the foregoing reasons, we AFFIRM the convictions, VACATE the sentences, and REMAND to the district court for resentencing consistent with this opinion.

---

[35] *United States v. Espinoza*, 677 F.3d 730, 734 & nn. 21-22 (5th Cir. 2012) (listing cases).

[36] *Id.* (quoting *United States v. Hayes*, 32 F.3d 171, 173 (5th Cir. 1994)).