# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 1, 2026

Lyle W. Cayce
Clerk

———————————

No. 25-50049

———————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Christopher Filline,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CR-32-1

———————————————————————

Before Willett, Wilson, and Douglas, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

Christopher Filline was Castroville's police chief. The Government alleged that he betrayed that position of public trust for private gain: arranging for his wife's damaged Lincoln Navigator to be destroyed, falsely reporting it stolen, and pocketing the insurance proceeds.

A jury agreed, convicting Filline of conspiracy to commit wire fraud. On appeal, Filline does not dispute that the Navigator was deliberately burned, that he filed an insurance claim, or that the claim traveled in

interstate commerce. His appeal presses a narrower point: the Government, he says, failed to prove the agreement that conspiracy requires.

True, the evidence was circumstantial. But circumstantial evidence is evidence. And here it came in mutually reinforcing layers: strained finances, repeated requests to "get rid of" the vehicle, recruitment of a known criminal relative, coordinated access to the Navigator, its destruction by fire, a false theft report, an insurance claim, and later concealment. Viewing that evidence as we must—in the light most favorable to the verdict—a rational jury could find beyond a reasonable doubt that Filline and at least one other person agreed to pursue the fraudulent objective.

We AFFIRM Filline's conviction.

I

In July 2016, Christopher Filline, then the police chief of Castroville, Texas, reported that his wife's 2007 Lincoln Navigator had been stolen. Two days earlier, the Navigator had been found burned on a remote road in Bexar County. Filline filed a police report with the Lytle Police Department and later submitted an insurance claim to Farmers Insurance Group.

The Government's theory was straightforward: the Navigator was not stolen; it was staged. Filline, facing mounting financial pressure and costly vehicle repairs, recruited others to dispose of the Navigator so he could report it stolen and collect the insurance proceeds. A jury convicted him of conspiracy to commit wire fraud.

A

The evidence began with motive. In 2016, the Fillines were under serious financial strain. They had substantial medical bills, about $30,000 in credit-card debt, and delinquent mortgage and car payments. Filline did not

keep those worries private. Multiple Castroville officers testified that he complained openly about money.

The Navigator added to the pressure. Filline called it the "piece of junk" Navigator, complained that it needed costly repairs, and repeatedly said he wanted someone to get rid of it. He even texted the mechanic who had quoted the repairs, asking him to "take [the Navigator] and burn it" and providing his address. The mechanic thought the message was a joke because it included "LOL."

Ambrose Rymers, an animal-control officer who worked for Filline, did not think the request was a joke. Rymers testified that Filline asked him to get rid of the Navigator on multiple occasions. Eventually, Filline asked Rymers whether he had any "piece of shit cousins" who would "take care of the vehicle and get rid of it." Another officer overheard that conversation. Rymers understood that helping would involve criminal conduct. But sympathetic to Filline's financial troubles, he agreed.

Rymers then contacted his cousin, Oscar Hernandez. Hernandez had a criminal history, and Rymers believed Hernandez "would do something like that." After Rymers explained that the police chief wanted to "get rid of the vehicle," Hernandez agreed to help. Rymers offered no payment or other consideration.

After Rymers told Filline that Hernandez was willing to help, Filline responded, "[G]et it taken care of. Get it done." Filline then arranged the opportunity. The Navigator would be parked near the police station with the keys inside and "would be ready." It remained there for two weeks prior to the burning.

In the wee hours of July 16, 2016, Rymers met Hernandez a few blocks from the police station. Hernandez walked to the Navigator, entered it without difficulty, and drove away. Rymers followed in another vehicle.

Hernandez drove the Navigator to a dead-end road in Bexar County, doused it with gasoline, and set it on fire. Rymers watched, then drove Hernandez away from the scene.

Two days later, Filline reported the Navigator stolen to the Lytle Police Department. He explained that the delayed report was due to initially believing one of his sons had borrowed the vehicle, only later concluding that it had been stolen from his driveway. Lytle officers Richard Priest and Benny Lopez testified that Filline's behavior was odd. Priest found it unusual that Filline was calm and collected rather than upset about the destroyed vehicle. Lopez described Filline as giving quick, short answers. Priest also found the reporting delay strange. After investigating, the officers found no witnesses, no signs of forced entry, and no evidence of a theft at Filline's residence.

The burning prompted separate investigations by the Bexar County Fire Department and a Farmers claims investigator. Fire Marshal Marcel Garcia inspected the Navigator and described it as a "total burn." Yet the vehicle still had the valuable components ordinarily removed in car thefts—tires, rims, and the like. After discovering the stolen-vehicle police report, Garcia interviewed Filline. Like the Lytle officers, Garcia found no evidence of forced entry or towing at Filline's residence and no witnesses to the alleged theft. He also learned that Filline kept a marked patrol vehicle at his home, which Garcia believed would deter most car thieves. Garcia also interviewed Rymers, who denied any knowledge of the alleged theft or burning.

Farmers opened its own investigation after Filline submitted an online claim on July 19, 2016. By then, Filline had already alerted his insurance agent to the purported theft—even before filing either the police report or the insurance claim. Two days later, Filline submitted a proof-of-loss form to Farmers. In it, he stated that he had parked the Navigator at home on Friday evening, placed the keys on hooks inside the residence, noticed the garage

door open the next morning, yet did not realize the vehicle was missing until Sunday.

Aaron Wood, a Farmers claims investigator, testified that this timeline conflicted with Filline's earlier statement that he noticed the vehicle was missing on Monday, not Sunday. Wood identified several red flags. Farmers ordinarily does not encounter a "vehicle recovered burned," he explained, because burning a vehicle leaves no profit for the thief. The delayed police report was another red flag, as was Filline's decision to contact his insurance agent before reporting the theft to police.

Wood also testified that the Navigator required a transponder key and that, in 2016, locksmiths could not make copies of the keys for that model. Because Filline had the only key, Wood viewed ordinary theft as far less likely. Wood also learned that the Fillines had unpaid medical bills in collections and were delinquent on their mortgage, the Navigator, and two other vehicles—facts that supplied a potential motivation for a fraudulent insurance claim.

Both the police and insurance investigations eventually stalled for lack of new leads. Garcia closed his inquiry, and Farmers paid roughly $14,000 to cover the remainder of the Navigator's loan.

The case went quiet until Hernandez was arrested two years later on unrelated charges. Statements he made at the arrest scene prompted the responding officers to make a series of calls, which led Garcia to reopen the 2016 arson investigation. After interviewing Hernandez, Garcia interviewed Rymers again. This time, he confessed. He identified Hernandez and Filline as his co-conspirators, and admitted that Filline had asked him to recruit a criminal family member to get rid of the Navigator.

The next day, Rymers secretly recorded a conversation with Filline. Filline expressed concern that Garcia had reopened the investigation and

confusion about why Rymers had been questioned. Filline also asked whether Garcia had mentioned Hernandez, whether the investigator "[had] something," and "what are we going to do about it?"

## B

After Garcia referred the matter for federal prosecution, a grand jury indicted Filline on one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Filline was not charged with substantive wire fraud. The indictment alleged that he agreed with two other people to defraud Farmers by electronically submitting a false insurance claim for the "stolen" Navigator.[1] Farmers processed the claim through its Oklahoma center and issued payment across state lines to Filline in Texas.

At trial, the Government's evidence fell in three main categories: (1) Filline's financial distress and desire to get rid of the Navigator; (2) the structure, secrecy, and coordinated execution of the plan; and (3) the participants' post-destruction conduct. Filline called two witnesses. His wife testified that she loved the Navigator, wanted to keep it, was disappointed with the replacement vehicle, and believed there was "no reason to burn" the Navigator because family help was available. She also acknowledged, however, that the Fillines were struggling financially and that fixing the Navigator would have cost thousands of dollars. She further testified that the Navigator was not parked at the house for at least two weeks before the incident, that the vehicle had only one set of keys, and that their son's car would have been in the driveway if he had borrowed the Navigator. Filline's father also testified that he would have lent Filline money if needed.

---

[1] One of the co-conspirators, Rymers, pled guilty to conspiracy to commit wire fraud.

No. 25-50049

Filline twice moved for judgment of acquittal during the three-day trial. Both times, he challenged the sufficiency of the evidence, arguing that the Government failed to prove an essential conspiracy element: that Filline agreed with another person to pursue the fraudulent objective. The district court denied both motions.

After the jury returned a guilty verdict, Filline renewed his motion for judgment of acquittal, again pressing his sufficiency arguments. The district court denied the motion. It then sentenced Filline to three years' probation, imposed a $5,000 fine, and ordered $14,388.25 in restitution.

Filline timely appealed. Later that same day, the district court entered an amended judgment making only nonsubstantive changes. Filline did not file a second notice of appeal.

## II

We have appellate jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. Filline's notice of appeal referenced the original judgment, not the amended judgment. But that defect does not defeat jurisdiction because "the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced or misled by the mistake."[2] At most, Filline's failure to file a second notice of appeal was a "technical defect[]" that "fall[s] into the category of a mistake in designating a judgment appealed from, which should not bar an appeal."[3] The amended judgment made no substantive changes

---

[2] *United States v. Henneberger*, 592 F. App'x 233, 235–36 (5th Cir. 2014) (per curiam) (quoting *Turnbull v. United States*, 929 F.2d 173, 177 (5th Cir. 1991)).

[3] *Id.* (cleaned up).

No. 25-50049

and created no new appealable issues. We treat the amendment as a clerical correction[4] and proceed to the merits.[5]

## III

Filline's sufficiency challenge is narrow. He does not dispute that the Navigator was deliberately destroyed, that he submitted an insurance claim, or that the claim traveled in interstate commerce. He argues only that the Government failed to prove an agreement—that is, at least one other person shared his fraudulent objective.

A conspiracy involves a "common scheme to commit an unlawful goal."[6] Such an agreement "need not be formal or spoken,"[7] and "may be inferred from [a] concert of action, . . . a collection of circumstances, and . . . surrounding circumstances."[8] "[T]here is no requirement that every member must participate in every transaction."[9] Even so, there must be enough evidence "from which a jury could infer beyond a reasonable doubt that there was a 'meeting of the minds to commit'" the unlawful act—not mere association, coincidence, or after-the-fact assistance.[10] And critically,

---

[4] *See* FED. R. CRIM. P. 36 ("[T]he court may at any time correct a clerical error in a judgment[.]").

[5] *Cf. United States v. Wiley*, 641 F. App'x 381, 383–84 (5th Cir. 2016) (unpublished) (proceeding to the merits where the appellant timely appealed from the original judgment but did not appeal from the later amended judgment and where the Government did not object).

[6] *See United States v. Ganji*, 880 F.3d 760, 768 (5th Cir. 2018).

[7] *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012).

[8] *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014) (quoting *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014)).

[9] *Id.* at 274.

[10] *United States v. Adkinson*, 158 F.3d 1147, 1154 (11th Cir. 1998) (quoting *United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988)).

No. 25-50049

"[t]he lack of direct evidence of agreement to commit a crime does not require reversal."[11]

Filline preserved his sufficiency challenge, so our review is *de novo*.[12] But our from-scratch review remains "highly deferential to the verdict."[13] We must affirm if, viewing the evidence and all reasonable inferences in the Government's favor, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[14] Put differently, we do not ask whether the verdict was correct. We ask only whether the jury's verdict was rational.[15]

On this record, yes. Viewed as a whole, the evidence allowed a rational jury to find that Filline and at least one other person agreed to make the Navigator disappear so Filline could report it stolen and seek insurance proceeds.[16]

---

[11] *United States v. Richards*, 204 F.3d 177, 208 (5th Cir. 2000), *overruled on other grounds by United States v. Cotton*, 535 U.S. 625 (2002); *see also United States v. Faulkner*, 17 F.3d 745, 768 (5th Cir. 1994).

[12] *Beacham*, 774 F.3d at 272.

[13] *United States v. Isgar*, 739 F.3d 829, 835 (5th Cir. 2014) (internal quotation marks and citations omitted).

[14] *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc); *see also Beacham*, 774 F.3d at 272.

[15] *United States v. Lopez-Monzon*, 850 F.3d 202, 206 (5th Cir. 2017).

[16] To prove conspiracy to commit wire fraud under 18 U.S.C. § 1349, the Government must show: (1) two or more persons agreed to commit wire fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully. *Beacham*, 774 F.3d at 272; *see also United States v. Greenlaw*, 84 F.4th 325, 339 n.4 (5th Cir. 2023); *United States v. Kuhrt*, 788 F.3d 403, 414 (5th Cir. 2015). The parties dispute only the first element.

No. 25-50049

A

The evidence did not rise or fall on any single fact. It worked cumulatively. Filline's financial distress supplied motive. The plan's structure, secrecy, and execution showed coordinated action. And the participants' conduct after the burning was not the object of the scheme, but the mechanism that made the fraudulent insurance claim possible.

1

First, the jury could infer a shared fraudulent objective from the collision of financial pressure and criminal assistance.

Filline was under serious financial strain: significant credit-card debt, unpaid medical bills, and delinquent mortgage and car payments. And he did not suffer those worries silently. He complained about them at work, repeatedly and openly. The Navigator intensified the strain. Filline called it a "piece of junk," complained about the cost of repairing it, and repeatedly said he wanted someone to get rid of it.

Rymers supplied the bridge from motive to agreement. He testified that Filline asked him several times to get rid of the Navigator, eventually asking whether he had any "piece of shit cousins" who would "take care of the vehicle and get rid of it." Rymers understood the request to involve criminal conduct. Yet he agreed because he knew Filline "needed help" and felt sorry for him.

That testimony mattered. It gave the jury a reason why Rymers joined the plan and what he understood the plan to be.[17] A rational juror could

_____

[17] *See United States v. Sanders*, 952 F.3d 263, 273–75 (5th Cir. 2020) (holding that the jury's "verdict may not rest on mere suspicion, speculation, or conjecture, or an overly attenuated piling of inference upon inference" (cleaned up)).

conclude that Rymers was not merely disposing of an unwanted vehicle. He was helping relieve Filline's financial pressure by making the Navigator disappear in a way that would support an insurance payout.[18]

2

Second, the plan itself showed agreement. This was not a case of mere association, passive assistance, or happenstance.[19] The evidence showed concerted action from beginning to end: recruitment, coordination, execution, secrecy, and concealment. That kind of coordinated conduct is classic circumstantial evidence of conspiracy.[20]

Start with the recruitment. Filline did not ask Rymers to sell the Navigator, abandon it, or send it to a junkyard. He asked Rymers to find a criminal relative who could "get rid of it." Rymers understood the request to involve criminal conduct. He then recruited Hernandez for that very reason—because Hernandez had a criminal background and, in Rymer's view, "would do something like that." Once Rymers told Hernandez that the police chief wanted to "get rid of the vehicle," Hernandez agreed.

The execution was just as choreographed. After Rymers confirmed Hernandez's involvement, Filline told him to "[g]et it taken care of" and said the Navigator would be parked near the police station with the keys

---

[18] The lack of payment to Rymers or Hernandez does not defeat this conclusion. Nor does it render the inference of a shared agreement irrational. Filline points to no case law that conspirators need to be compensated to join a fraudulent plan. Nor could he. *See Beacham*, 774 F.3d at 272 (agreement may be inferred merely from a concert of action and surrounding circumstances); *United States v. Brooks*, 681 F.3d 678, 699–700 (5th Cir. 2012) (same).

[19] *Cf. Ganji*, 880 F.3d at 768 (recognizing that mere association or relation is insufficient to establish an agreement).

[20] *E.g.*, *Beacham*, 774 F.3d at 272; *Brooks*, 681 F.3d at 699–700; *Richards*, 204 F.3d at 208.

inside. The vehicle remained there for two weeks. Hernandez then retrieved it without difficulty and drove away while Rymers followed in another vehicle. That sequence allowed the jury to see coordination, not coincidence. The car was staged. The keys were visible. Hernandez arrived. Rymers followed. The plan worked exactly as arranged.

The plan was secretive, too. Cell-phone records showed repeated texts between Filline and Rymers immediately before and during the Navigator's destruction. But once the vehicle was taken, Filline told Rymers, "we're not going to talk about this ever again," and threatened to kill him if he did. Rymers complied. A rational jury could treat that command, that threat, and that silence as evidence that both men understood the stakes. This was not ordinary disposal of an unwanted vehicle. It was a plan that required distance, deniability, and silence.

The method of destruction reinforces the point. Hernandez did not strip the Navigator for parts, sell it, abandon it, or junk it. He burned it completely and left it on a remote road. Investigators testified that burning a vehicle provides no profit to thieves and is inconsistent with ordinary car theft. And burning was no accident of execution; it was the very method Filline himself had suggested when he asked his mechanic to "take [the Navigator] and burn it." A rational jury could infer that the fire served the fraud: it destroyed the unwanted vehicle, obscured what had happened, and supplied the predicate for a false theft report.

Taken together, these facts permitted a rational jury to find a shared unlawful objective. The evidence did not show isolated favors or accidental overlap. It showed a coordinated plan in which at least two people worked to make the Navigator disappear while keeping Filline's role hidden, so that he

could pursue a fraudulent insurance claim. That is enough to support a finding of agreement beyond a reasonable doubt.[21]

3

Third, the post-destruction conduct confirmed what the preceding evidence already suggested: the Navigator's destruction was not the end of the scheme, but the means by which the fraudulent insurance claim could begin.

The false police report and insurance claim were suspicious from the start. Filline gave inconsistent accounts of when he discovered the Navigator was missing. He delayed reporting the supposed theft and contacted his insurance agent before filing the police report. And he retained the only transponder key—a fact from which the jury could infer that either Rymers or Hernandez returned the key after burning the vehicle. A rational jury could view these facts as evidence that the Navigator's destruction and the insurance claim were not independent events, but linked parts of a single fraudulent plan.

The later concealment evidence pointed in the same direction. When Garcia first questioned Rymers, Rymers denied involvement. The jury could consider that denial alongside Filline's earlier command that Rymers "never" speak of the matter again—and his threat to kill Rymers if he did. Together, that evidence allowed the jury to infer that the participants understood the burning was not a standalone act of vandalism or vehicle disposal. It was part of a larger fraud whose success depended on keeping Filline separated from the burning and preserving the appearance of a

---

[21] "[E]vidence of the *conspirators' individual actions*" could rationally indicate "an agreement to commit an unlawful objective beyond a reasonable doubt." *Ganji*, 880 F.3d at 768–69 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 754 (1984)).

genuine theft. Nor was the jury required to accept Filline's alternative theory that all this secrecy was merely meant to spare his wife's feelings.

Filline's later conduct reinforced that inference. After Hernandez was arrested on unrelated charges, Filline went to the arrest scene and privately spoke with Hernandez in the back of a patrol vehicle. When one responding officer later tried to retrieve the video of that conversation, the video was gone. The officer's report about the encounter also went missing. A rational jury could view that private conversation, followed by missing documentation, as evidence of a continuing effort to protect the scheme.

So, too, with Rymers's secret recording of his later conversation with Filline. Filline asked why Garcia had reopened the investigation, why Rymers had been questioned without advance notice to Filline, whether the investigator "[had] something," and "what are *we* going to do about it?" He also asked whether Garcia had mentioned Hernandez and repeatedly insisted that he and Rymers "ha[d] nothing to do with this." A rational jury could treat that exchange as evidence that Filline wanted to manage what Rymers would say to Garcia—just as the jury could infer that he had tried to do so with Hernandez at the arrest scene—and as evidence of Rymers's awareness of the broader scheme. And Filline's use of "we" permitted the jury to infer that Filline understood that both he and Rymers were exposed by the renewed investigation into the Navigator's staged disappearance.

True, the recorded conversation did not expressly mention insurance fraud. But direct evidence was not required. "[C]onspirators normally attempt to conceal their conduct,"[22] and the jury could infer agreement from

---

[22] *United States v. Posada-Rios*, 158 F.3d 832, 858 (5th Cir. 1998) (citing *United States v. Espinoza-Seanez*, 862 F.2d 526, 537 (5th Cir. 1988)).

the "[c]oncert of action,"[23] "the development and collocation of circumstances,"[24] and the "interconnected" relationships among Filline, Rymers, and Hernandez. Rymers may have played a "minor role," but the Government did not have to prove that he knew every detail of the insurance claim. It was enough that the evidence permitted the jury to find that he knowingly joined the unlawful objective. That inference was reinforced by Rymers's testimony that he pleaded guilty to a "conspiracy involv[ing] the burning of the vehicle" and identified Hernandez and Filline as his co-conspirators. The Government summarized the point in closing: "[Rymers] and his cousin took the vehicle. They destroyed it at the direction of Mr. Filline so that Mr. Filline could get out from underneath [his] lien."

A rational jury could therefore view this post-destruction conduct not as an afterthought, but as the natural continuation of the earlier agreement. The jury was not required to treat the false report, insurance claim, concealment, missing video, missing report, and recorded conversation as disconnected aftershocks of a completed car disposal. It could have viewed them instead as the anticipated next steps in the same fraudulent plan: make the Navigator disappear, keep Filline's role hidden, report the vehicle stolen, and seek insurance proceeds.

\* \* \*

To be sure, the Government's case was circumstantial. But circumstantial evidence is not second-class evidence. It often proves its force cumulatively: facts that may look ambiguous in isolation can point decisively in one direction when viewed together. Juries may use reason and common

---

[23] *Richards*, 204 F.3d at 208 (citation omitted).

[24] *Posada-Rios*, 158 F.3d at 857 (quoting *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992)).

sense,[25] and the Government need not show that each conspirator expressly agreed to every feature of the fraud.[26]

No single fact had to carry the verdict alone. Not Filline's financial distress. Not the burned Navigator. Not the delayed police report. Not the insurance claim. Not the missing video, the missing report, or the recorded conversation. Sufficiency review asks whether the evidence as a whole—strand by strand, fact by fact, inference by inference—could support a rational verdict. Here, it could.

Viewed together, the evidence allowed the jury to infer that the Navigator's destruction was not the scheme's endpoint. It was the opening act. The plan was to make the vehicle disappear, keep Filline's role hidden, report the Navigator stolen, and seek insurance proceeds. The Government did not have to prove that every participant knew every downstream detail. It was enough for the jury to find that Filline and at least one other person shared the fraudulent objective.

## IV

We do not sit as a thirteenth juror. Our task is not to retry the case or second-guess the jury's common-sense inferences. It is to decide whether a rational jury could have returned this verdict. On this record, and under that deferential standard, the answer is yes. A rational jury could find beyond a reasonable doubt that Filline did more than arrange for the Navigator's

---

[25] *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989).

[26] *See, e.g.*, *Beacham*, 774 F.3d at 272 ("An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." (quoting *Simpson*, 741 F.3d at 547)).

No. 25-50049

destruction. It could find that he and at least one other person agreed to make the vehicle disappear as the first step in an insurance-fraud scheme.

We AFFIRM.