# United States Court of Appeals
## for the Fifth Circuit

———————

No. 23-20483

———————

United States Court of Appeals
Fifth Circuit

**FILED**

August 22, 2024

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

RICHARD PLEZIA,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CR-450-5

———————————————————————

Before HIGGINBOTHAM, STEWART, and HIGGINSON, *Circuit Judges*.

CARL E. STEWART, *Circuit Judge*:

Richard Plezia ("Plezia") challenges his convictions of conspiracy to defraud the United States, making false statements, and falsification of records in a federal investigation following a fifteen-day jury trial. He challenges the sufficiency of the evidence for some of the convictions, the district court's determination that the statute of limitations for one count of making false statements was equitably tolled, and the district court's decision to allow two witnesses to testify with the aid of prior recorded recollections. Because we agree with Plezia that equitable tolling of the statute of limitations in 18 U.S.C. § 3282 is not available, we VACATE Plezia's conviction under

No. 23-20483

Count Five and remand with instructions to dismiss Count Five with prejudice. However, the panel's agreement with Plezia ends there. With respect to every other assignment of error, we AFFIRM.

## I. Factual Background

Plezia was a Houston-based personal injury attorney charged with conspiracy to defraud the United States through falsified reporting on tax returns to the Internal Revenue Service ("IRS"). The alleged falsified gains arise from barratry, the impermissible practice of attorneys soliciting clients that have not invited any contact with prospective counsel. The Government averred that Plezia conspired with a group of personal-injury attorneys and non-attorney case runners ("case runners") in Houston, Texas to unlawfully reduce the federal income taxes owed by Jeffrey Stern ("Stern"). The case runners were alleged to solicit clients for Stern—in violation of the Texas Penal Code and the Texas Disciplinary Rules of Professional Conduct ("TDRPC"). The charging instrument set out that Plezia worked with case runner Marcus Esquivel ("Esquivel") to aid Stern in reducing the income taxes he owed from 2011 through 2013. It alleged that Stern "funneled" illegal payments for soliciting and "running" cases to Esquivel by writing checks to Plezia—who subsequently wrote corresponding checks out to Esquivel's business entities. Stern would then deduct the amounts paid to Plezia as attorney "referral fees."

### A. The Indictments and Pretrial Proceedings

In August 2019, Stern was arrested and charged with conspiracy to commit fraud against the United States, willfully filing a false tax return, and obstruction of justice. Stern pleaded guilty to the first two counts and agreed to pay over $4.35 million in restitution to the IRS and cooperate with the prosecution and investigation of other attorneys involved in the scheme. On August 6, 2019, the grand jury indicted Plezia on one count of conspiracy to

defraud the United States in violation of 18 U.S.C. § 371 ("Count One"). On January 18, 2022, the grand jury returned a Third Superseding Indictment adding two counts of making false statements to IRS agents in violation of 18 U.S.C. § 1001(a)(2) ("Counts Five and Six") and one count of falsifying records in violation of 18 U.S.C. § 1519 ("Count Seven").

Count One's allegations against Plezia are limited to his participation in redirecting checks to Esquivel. Count Five sets out that Plezia falsely told an IRS agent in Houston in December 2016 that he had never paid Esquivel any referral fees for clients in violation of the Texas bar rules. Count Six avers that Plezia made another materially false statement to IRS agents in September 2018 when he averred that any payments between him, Esquivel, and Stern were provided solely for the purpose of financing his ongoing benzene exposure toxic tort litigation against BP. Lastly, in Count Seven, the Government alleged that Plezia created a false document supporting or tracking the false statement he made in Count Six with the intent to impede a federal investigation under the jurisdiction of the IRS.

Plezia pleaded not guilty to all charges and proceeded to a jury trial on January 9, 2023. He moved to dismiss the entirety of the Third Superseding Indictment for constitutional violations. Plezia argued that the Government's delay in prosecuting all charges violated his Fifth and Sixth Amendment rights. He also filed a separate motion to dismiss Count Five as barred by the five-year statute of limitations in 18 U.S.C. § 3282 because it was filed over five years after the alleged false statement was made. He asserted that Count Five was filed five years and forty-two days after the alleged false statement was made even though the Government had all relevant information to charge him with that offense for at least three years before the Third Superseding Indictment. The Government opposed both motions and argued that the statute of limitations had been tolled due to the delays arising from its compliance with the district court's COVID orders

and from delays in processing Justice Department approvals during the pandemic. It further argued that the discovery of evidence of Plezia's involvement in Stern's scheme was hindered by COVID delays related to several steps of the investigation which prompted the addition of Count Five.

In April 2022, the district court held a pretrial hearing to address Plezia's motions to dismiss the indictment. With respect to his motion to dismiss the entire indictment, Plezia argued that he was prejudiced by the delay. The Government countered that it had adequately apprised Plezia of the charges against him at an April 2021 reverse proffer meeting. The Government attributed the delay in action between April 2021 and January 2022 to delays in seeking approval from the Department of Justice, Tax Division for the newly added charges in the indictment and a warrant to search Plezia's computer. The Government filed the indictment before fully analyzing the materials retrieved from Plezia's computer. The district court denied the motion because it did not "believe that the defendant has shown either that the [G]overnment acted for the bad purpose of gaining a tactical advantage" or "some other bad-faith purpose."

On his motion to dismiss Count Five due to the statute of limitations, Plezia asserted that the district court could not relax congressionally mandated statutes of limitations, even during the COVID-19 pandemic. He further argued that the Government also failed to act with the due diligence required to receive the benefit of equitable tolling. The Government contended that it relied on the district court's COVID-related orders tolling the statute of limitations. It further elaborated that, while COVID did not delay the Tax Division's approval of certain actions, it did delay the Government's debriefing of Stern which then provided the evidence that tied Plezia's conduct to the newly added charge in Count Five. The district court acknowledged the difficulty of analyzing the statute of limitations issue, noting that "[t]here is surprisingly scant case law on it." The district court

then denied the motion to dismiss Count Five because Plezia was apprised of the charges against him as early as April 2021.

### B. The Trial

Trial began on January 9, 2023, and took place over four weeks with over thirty witnesses testifying. The prosecution opened its case by detailing how Stern adjusted the financing of his legal practice following an audit in 2010—allegedly by disguising payments to case runners by funneling payments through other attorneys and deducting those payments as referral fees on his tax returns. It averred that some attorneys implicated in Stern's scheme had no knowledge of this process and that some case runners would forge those attorneys' signatures before cashing the checks. On the other hand, some attorneys knew that they were receiving money from Stern to execute a kickback payment to a case runner, often also partaking in deducting any payments as referral fees or fees for other services. The Government argued that Plezia fell into the latter category of attorneys implicated in this underreporting scheme.

The prosecution called several witnesses during its case in chief. It first called IRS agent Loc Nguyen ("Nguyen") to testify about the investigation into Stern's law firm and properties from 2011 to 2013. Nguyen detailed the Stern's method of writing Plezia checks during that period, recording those funds as attorney referral fees in his business records, and then deducting those amounts from his taxable income. He stated that Stern's 2012 law firm ledgers indicated referral fee payments to Plezia in several large amounts. He noted that these types of fees are ordinarily claimed as deductions on a company's tax return and reduce the total tax liability. He further testified that Stern generated a 1099 tax form for referral fees paid to Plezia to document the payments, and in 2013, the amount totaled $143,000 in non-employee compensation to Plezia. Nguyen

maintained that Plezia's own accounting showed that Plezia would promptly issue a check redirecting funds received from Stern to Esquivel or his business entities from early 2011 to early 2013. He determined that Plezia's payments to Esquivel from 2011 to 2013 totaled over $500,000.

Stern then took the stand. Stern testified that he used case runners for a period of ten years—most frequently working with Esquivel, Fred Morris ("Morris"), and Lamont Ratcliff ("Ratcliff")—to solicit personal-injury clients. He further contended that he dealt with each case runner separately, never involving the case runners in each other's activities. He averred that he would pay his case runners about $1 million a year collectively and opted to disguise the payments by issuing checks to their closely held businesses or by redirecting the funds through another lawyer to give the appearance of a permissible referral fee amongst attorneys. He acknowledged that the disguised payments through other attorneys could easily be employed as deductible business expenses. He further testified that he knew that the use of paid case runners was illegal and prohibited by the professional conduct rules of the Texas State Bar. He admitted that he knew that the ethics rules only permitted the payment of referral fees to other attorneys for referring clients, and that the payment of referral fees to non-attorneys is categorically prohibited.

Stern asserted that he began paying Esquivel purportedly for advertising services for his law firm to conceal the case running payments. He stated that he purchased many cases from Esquivel over the course of two decades and would often pay Esquivel a set amount up front in addition to twenty percent of the attorney's fee exacted when the case resolved. He averred that following his audit in early 2011, he and Esquivel agreed to alter the method of concealing payments for case running services by funneling payments through Plezia. He further testified that Esquivel was also working for Plezia at the time. Stern further stated that at the time he began using

Plezia as a funnel, he had limited dealings with him. Stern stated that he never discussed the payment arrangement with Plezia because Esquivel told him that they would handle it privately.

Stern testified that Esquivel kept a ledger detailing the cases he referred to Stern, and reviewed the checks he issued to Plezia to demonstrate that each check was issued to pay Esquivel for his case running services. He contended that, when a case (routed through Plezia) was resolved, Stern would meet with Esquivel, show him the requisite documents as proof of resolution, and then issue a check to Plezia. He further averred that Esquivel would then run the check over to Plezia to issue a check back to Esquivel or his business entities. Stern explained that, after the IRS began investigating him for tax evasion in 2016, he took actions to cover up his dealings with Esquivel. He testified that he shredded documents and informed Plezia and Esquivel of the investigation in Fall 2016. He testified that Plezia informed him at a holiday party in December 2016 that he had been interviewed by IRS agents and that he refrained from directly answering their questions. Stern also recounted that Plezia met with his defense attorneys shortly after.

Stern further stated that other attorneys he worked with had claimed that they used funds from Stern to pay clients' medical bills instead of writing checks for case running services. Stern testified that Plezia was subpoenaed by the grand jury and responded to the subpoena by producing a letter dated August 24, 2010, from Plezia to Stern. At trial, Stern stated that he had "never seen that document before." The letter purported to set out "a proposal for the referral and fee agreement for the BP cases that" Plezia retained. The search warrant executed on Stern's law office turned up no documents related to the BP cases on the firm's computer systems. Stern testified that any checks from this period issued to Plezia were illegal kickbacks to be paid to Esquivel through Plezia. He further opined that it

would have been fairly obvious to someone in Plezia's position, given past dealings with Esquivel, that this was an illegal kickback scheme.

Although Plezia maintained that Stern represented that payments were legitimate third-party financing of Plezia's mass toxic tort action against BP, Stern disavowed ever making that representation. Plezia's BP case initially involved over 800 clients, and Stern had written $532,000 in checks from 2011 to 2013. Stern maintained that Esquivel orchestrated the deliveries of checks with Plezia. He also admitted that he had "no idea" what information Esquivel gave Plezia regarding the nature of the checks. Stern further asserted that only $424,000 of the $532,000 was paid to Plezia, with the remaining $108,000 deposited directly into Esquivel's accounts in 2013.

Stern's defense attorneys, David Gerger and Dean Blumrosen, also testified against Plezia. Gerger testified that he had interviewed Plezia during the course of representing Stern and kept extensive notes of their meeting. The Government then sought to admit the interview notes as business records and as recorded recollections under Federal Rule of Evidence 803(5) & (6). Plezia timely objected. The district court determined that it would be best for the Government to refresh the witness's recollection with the documents but not admit them into the record. However, because Gerger was still unable to adequately recall the 2016 interview with Plezia after reviewing the notes, the district court allowed the notes and their accompanying memoranda to be read into evidence over Plezia's objection.

The memorandum stated that Plezia sought Stern's aid to finance his BP litigation, and that while Plezia thought that they did not have a written agreement governing the fee schedule, he believed that they orally agreed upon Stern paying about $500,000. It further stated that Plezia arranged for Esquivel to do the "legwork" on the cases, coordinating with about 400 plaintiffs living close to the BP plant alleged to emit high levels of benzenes.

*Id.* Plezia explained that while Esquivel charged his expenses, plus a per client fee, the BP litigation was ultimately not profitable. The same was done with Blumrosen's notes from his interview with Plezia. Blumrosen testified, based on his notes, that Plezia reached out to Stern to inquire about financing before Esquivel did. Blumrosen further testified that Plezia failed to provide him with invoices from his dealings with Stern and Esquivel as promised during the meeting.

Over half a dozen employees from Plezia's and Stern's law firms also testified for the prosecution. This included other attorneys and law firm office managers and staff, including Stern's law firm's controller[1]—and all testified that they did not know that Stern had financed Plezia's BP litigation or whether Plezia paid Esquivel for his work on the BP litigation after early 2011. For instance, Plezia's legal assistant, Lilia Sosa, testified that in her six years working on the BP litigation with Plezia, she never saw Stern at case or client meetings or heard that Stern financed any of those cases. Stern's office controller, Robert Koenig, stated that after Stern's firm was audited in 2011, they began to send far more 1099 tax forms out to parties that they contracted with. Koenig further testified that if Plezia had received a 1099 form for services rendered, it would be clear that the funds described there would be income for Plezia and deductible business expenses for Stern. Stern's accountant, Stanley Toy, testified to the same.

Plezia's accountant, Marcus Dillon, testified that he was never informed that Stern's checks from 2011 to 2013 were "pass-through" payments to Esquivel for case referrals to Stern. Dillon further opined that Plezia filed "false" income tax returns during 2011, 2012, and 2013, because

---

[1] An office controller is the individual responsible for issuing checks on the behalf of the firm..

he treated Stern's checks as income while also deducting the corresponding checks that he wrote to Esquivel out of those funds, as business expenses. Morris testified that he served as a case runner for attorney Roy Abner ("Abner") and Stern during that same period. He stated that he solicited clients for Abner in exchange for cash. Morris stated that he also solicited clients for Stern, using Abner as a middleman, but testified that he did not know Plezia or anything about his business. Morris further asserted that Plezia and Esquivel were not involved in or privy to any payment structures orchestrated by Stern and Abner. Another case runner in Stern's network, Ratcliff, similarly testified that after initially getting paid directly by Stern, he received "disguised" payments funneled through checks re-directed by attorney Deborah Bradley, an associate in Stern's law office. Ultimately, Ratcliff noted that he also did not know Plezia.[2]

Esquivel also took the stand and testified that he offered case running services to personal injury attorneys in Houston for three decades. He described his standard practices: he would purchase accident reports and then approach victims to get them to seek legal counsel. He stated that he was initially paid $500 for each case he referred to a personal injury attorney. He further testified that over time, he would receive a larger sum up front for referring commercial cases and would also receive a percentage of the attorney's fees collected after settlement. Esquivel stated that he set up nearly half a dozen businesses solely to collect case referral payments from Stern and other attorneys.

Esquivel further noted that while he made hundreds of thousands of dollars through referring cases, he never received a 1099 form from Stern.

---

[2] The jury also heard from William Shepherd, a case runner that worked for Plezia from 2018 to 2021. He testified that Plezia would pay him for leads as a case runner by checks written to him personally or to one of his business entities.

Esquivel further corroborated Stern's testimony that, during the 2010s, they switched from making case running payments in cash to checks to "hide" illegal kickbacks for case running services and "use [the payments] as a deduction on [Stern's] tax returns." He testified that he first connected with Plezia in 2010 and that Plezia paid him in checks labeled as "website marketing expense[s]" even though he did not create a website for Plezia's firm. Esquivel further explained how he solicited clients for Plezia's BP litigation, marketing the cases as very lucrative at a town hall event. He noted that he referred most of the cases by November 2010, and that he received his last payment for services on the BP litigation from Plezia in early 2011.

Esquivel testified that Plezia only worked with attorney Dan Cartwright on the BP litigation, and that Stern did not provide financing and was not involved in any other way. Esquivel stated that after addressing the amounts that Stern owed him in early 2011 for prior underpaid case running services, they agreed to run the checks through Plezia. He stated that Plezia agreed to redirect payments from Stern to his business entities as a favor. Esquivel testified that he did not tell Plezia that the money was from BP litigation, which had wrapped up by that time, and he did not testify that he told Plezia the money was for any legitimate business endeavor. He further stated that he reviewed each check from Stern to Plezia, and that none were for the BP litigation, even where the deposit referenced BP.

Esquivel testified that Stern told him that he was under investigation in 2016. He further averred that they both purchased burner phones to communicate with each other after Esquivel was contacted by IRS Agent Robert Simpson ("Simpson"). He stated that they decided to conceal the payments by telling Simpson that they were designed to finance the BP litigation. He testified that Plezia was informed of the plan and did not object to the proposed cover-up.

Simpson testified that he interviewed Plezia on December 7, 2016, at a coffee shop in Houston and on September 28, 2018, via the telephone. Simpson recounted the December 7, 2016 meeting in which Plezia stated that the checks he received from Stern during the relevant period were likely related to his BP litigation. He noted that Plezia also told him that there were discrepancies in the dating of payments or checks dated in 2013, years after his BP litigation ended. Simpson further averred that Plezia informed him that Esquivel conducted investigative, marketing, and advertising work for his firm and that he never paid Esquivel any client referral fees.

Simpson alleged that he had not reviewed Stern's bank records before the December 2016 meeting, but that his review of the numerous transactions between Stern and Plezia raised suspicion of illegitimate payments being funneled through Plezia. In response to a grand jury subpoena, Plezia opted to turn over documents to Simpson for review in the Fall 2018. On September 28, 2018, Simpson interviewed Plezia a second time. Simpson testified that in that interview, Plezia mentioned an August 24, 2010 letter to Stern which set out that checks from Stern to Plezia were offered to finance his BP litigation. He testified that Plezia stated that any checks deposited to BelMark, a company owned by Esquivel, were issued for the purpose of paying clients' medical deposits as a result of Esquivel's investigative work on the BP case. Simpson also averred that—while Plezia told him twice during the September 2018 interview that Esquivel was responsible for paying medical deposits—other correspondence and records made clear that there were no medical deposits to be paid at the outset of the case.

Following the prosecution's close of its case, Plezia moved for a judgment of acquittal. He argued that the evidence was insufficient to sustain his 18 U.S.C. § 371 conspiracy charge and the charge of making false statements arising from his meeting with Simpson in December 2016. The district court denied the motion. Plezia then called several witnesses and

even took the stand himself. He called Mikal Watts, a personal injury attorney, as an expert witness opining on toxic tort cases like Plezia's BP litigation. Watts explained that while there are ethical ways to acquire clients in personal injury cases, the method of "barratry" or "case-running" is broadly considered unethical. However, Watts testified that the rules prohibiting those methods are "[g]enerally not enforced in" Texas. He further testified that Plezia was aware of the Texas barratry statute and the disciplinary rules provision prohibiting client solicitation and sharing attorney's fees with non-attorneys.

Plezia testified that he never discussed case running with Esquivel and had never paid Esquivel for any cases. He stated that he did not learn of Esquivel's case running affairs until he was indicted. He further asserted that it was not typical to use case runners in his practice and that while several case investigators he knew turned out to be case runners, they either denied it when he asked them previously or concealed such activity from him. He further testified that a few weeks after he began working with Esquivel, Esquivel told him that Stern would finance his remaining BP benzene cases. Plezia averred that he then prepared the August 2010 letter after that conversation. He did note that the letter stated that it was sent "via facsimile" but did not contain a signature and fax number. Plezia explained that he was often out of the office during that time period and that, while he would not have been there to see the fax sent after dictating it, correspondence would have been faxed when he dictated it, and he knew that Stern received the letter because he started getting checks for BP expenses from Stern.

Plezia asserted that he received invoices from Esquivel, but on cross-examination, Plezia admitted that the documents he alleges he received looked different than Esquivel's invoices to other attorneys. He also admitted on cross that despite what the August 2010 letter said about using Stern's

payments to cover medical expenses, he never had to pay any medical expenses or deposits for his BP litigation clients.

Plezia subsequently renewed his motion for judgment of acquittal and moved for a new trial which the district court denied on September 14, 2023. Ultimately, the jury convicted Plezia on all counts. He renewed his motion after the verdict, challenging the sufficiency of the evidence on all four counts. The district court denied the motion. At sentencing, the district court sentenced Plezia to six months and one day in prison, followed by two years of supervised release. He timely appealed. On October 24, 2023, the district court granted Plezia's motion for release on bond during the pendency of his appeal.

## II. Discussion

Plezia raises five assignments of error on appeal. He argues that (1) the district court abused its discretion in tolling the statute of limitations for Count Five; (2) there was insufficient evidence to sustain his § 371 conspiracy conviction in Count One; (3) the Government failed to adduce any evidence of venue to sustain Count Six; (4) the Government failed to meet its burden of proof as to his § 1519 conviction in Count Seven; and (5) the district court abused its discretion in allowing Blumrosen and Gerger to read from their notes from witness interviews with Plezia. We address each in turn, beginning with the equitable tolling issue.

### a. Equitable Tolling of Count Five

On appeal, Plezia contends only that equitable tolling is not available under § 3282 and does not argue that, if equitable tolling were available, its invocation would have been an abuse of discretion. As the Government agrees, our review of this contention is de novo. *See United States v. McMillan*, 600 F.3d 434, 443-44 (5th Cir. 2010) ("We review the district court's fact findings in relation to the statute of limitations for clear error and

its legal conclusions de novo." (internal citation and italics omitted)). "The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions." *Toussie v. United States*, 397 U.S. 112, 114 (1970). Section 3282 sets out the general statute of limitations for federal, non-capital offenses. It provides that:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

18 U.S.C. § 3282. Congress has expressly provided for the extension or tolling of criminal statutes of limitations for the Government to obtain evidence of an offense from a foreign country, 18 U.S.C. § 3292, during wartime, 18 U.S.C. § 3287, and during periods where a fugitive flees from justice, 18 U.S.C. § 3290, among other occurrences. Absent from this list of exceptions is any word from Congress providing that a global health crisis suspends a criminal statute of limitations.

In support of its argument that equitable tolling applies to § 3282, the Government cites the Third Circuit's decisions in *United States v. Midgley*, 142 F.3d 174 (3d Cir. 1998), and *United States v. Terlingo*, 327 F.3d 216 (3d Cir. 2003). In *Midgley*, the Third Circuit confronted the question of whether equitable tolling applied to allow the reinstatement of charges dismissed under the defendant's plea agreement after an intervening change in Supreme Court precedent. *See id.* at 181. The *Midgley* panel noted, in dicta, that the Third Circuit had "observed that criminal statutes of limitations are subject to tolling," *id.* at 178, but one case it cited for the proposition addressed one of the express exceptions we have cited above, *see United States v. Levine*, 658 F.2d 113, 120 (3d Cir. 1981) (acknowledging that statutes

of limitations may be tolled for fugitives), and the other case was a civil case emphasizing the rights that a civil statute of limitations protects by analogy to criminal statutes of limitations, *see Powers v. Southland Corp.*, 4 F.3d 223, 233 (3d Cir. 1993). In *Midgley*, the panel ultimately declined to toll the statute of limitations to allow the reinstatement of the dismissed charges. 142 F.3d at 179. In *Terlingo*, the Third Circuit tolled the time limit to allow the district court to impose criminal restitution post-conviction more than ninety days after sentencing. *See* 327 F.3d at 222.

The general premise gleaned from the Third Circuit's determinations in *Terlingo* and *Midgley* is that post-conviction time limits in criminal cases may be subject to equitable tolling. *See* 327 F.3d at 222; 142 F.3d at 177–78. This general premise cannot be applied to override the Supreme Court's statement that "a defendant's right to a fair trial would be prejudiced" by undue delay of the trial beyond the period of limitation prescribed for the charge against him. *United States v. Marion*, 404 U.S. 307, 322 (1971). Thus, the Government's arguments and the facts of this case do not eclipse the plain language of § 3282. *See Toussie*, 397 U.S. at 114–15 (noting that the statute of limitations is an expression of Congress's will to limit a charged individual's exposure to criminal prosecution to the time period which it prescribes).

Here, the Government alleges that Plezia made materially false statements to Simpson at an in-person interview on December 7, 2016. Plezia was first charged with this offense in the Third Superseding Indictment on January 22, 2022. Thus, the charge was brought over five years after the alleged offense was committed. Because the applicable statute of limitations is five years and Congress has provided no express grant to suspend it based on a global pandemic, the district court erred in denying Plezia's motion to dismiss Count Five of the Third Superseding Indictment. Thus, we vacate Plezia's conviction under Count Five.

*b. Sufficiency of the Evidence for Count One*

Plezia also challenges the sufficiency of the evidence to sustain his 18 U.S.C. § 371 conspiracy conviction. We review an appropriately preserved sufficiency of the evidence claim de novo. *United States v. Brannan*, 98 F.4th 636, 638 (5th Cir. 2024). We are limited to reviewing the evidence "in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Shum*, 493 F.3d 390, 391 (5th Cir. 2007). Notably, a court's review of a jury verdict is "highly deferential." *United States v. McNealy*, 625 F.3d 858, 870 (5th Cir. 2010). To sustain a conviction under 18 U.S.C. § 371, the Government must prove three elements: "(1) an agreement between two or more people to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the conspirators in furtherance of the conspiracy's objective." *United States v. Porter*, 542 F.3d 1088, 1092 (5th Cir. 2008) (citing 18 U.S.C. § 371).

Plezia raises three arguments as to the insufficiency of the evidence supporting his § 371 conviction: (1) insufficient evidence as to an agreement to illegally reduce Stern's tax liability, (2) insufficient evidence that Plezia knew that the case running sums were not truly tax-deductible under 26 U.S.C. § 162(c)(2), and (3) a conspiracy variance claim. We begin first with his argument as to the agreement.

*i. Agreement*

Plezia argues that there is no evidence that he "specifically intended to obstruct the IRS's lawful functions concerning Stern's taxes." But Plezia can point to no binding precedent that requires this evidence in order to sustain a § 371 conviction. His argument also fails to account for the

17

established principle that "[a]n agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Chon*, 713 F.3d 812, 818–19 (5th Cir. 2013). At the outset, we note that this court has long held that "[d]irect evidence of a conspiracy is unnecessary; each element *may be inferred from circumstantial evidence*." *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994) (emphasis added). Based on our close review of the record, we conclude the jury was presented with sufficient circumstantial evidence from various sources suggesting that Plezia tacitly agreed to join in an illegal enterprise to underreport taxable income.

Stern and Esquivel directly testified as to the how their scheme of kicking back illegal referral fees to non-attorneys was conducted. Esquivel testified that Plezia did not object to the payment scheme when he was told what the checks were for. His testimony that Plezia worked with case runners for his own practice provides further circumstantial evidence that he understood that ill-gotten gains would be excluded from taxable income *somewhere* in the chain of transactions as a result of his participation in this scheme. The jury was entitled to assign minimal weight to Plezia's testimony that he never worked with case runners and that he was never told that the purpose behind the payments was illegal because the testimony of several other witnesses contradicted his testimony and prior representations to IRS agents. *See United States v. Stacey*, 896 F.2d 75, 78 (5th Cir. 1990) (quoting *United States v. Holbert*, 578 F.2d 128, 130 (5th Cir. 1978)).

Plezia's argument partially relies on the Eleventh Circuit's analysis from *United States v. Kottwitz*, 614 F.3d 1241 (11th Cir. 2010). In *Kottwitz*, the court held that, to sustain a § 371 conviction, the prosecution must demonstrate "that each alleged conspirator knew that the scheme would culminate in the filing of false tax returns." 614 F.3d at 1265. However, the

*Kottwitz* court also noted that the purpose of filing false tax returns need not be the only object of the conspiracy and that the prosecution may prove the existence of common goals through circumstantial evidence. *Id.*; *see also United States v. Hough*, 803 F.3d 1181, 1188–89 (11th Cir. 2015) (holding same). It is possible on this record that a rational jury could have concluded through the circumstantial evidence presented that Plezia, Stern, and Esquivel shared common goals, including the underreporting of illicit income. Our review of a jury's verdict is "highly deferential." *United States v. Fisch*, 851 F.3d 402, 406 (5th Cir. 2017). Given this deference to the jury's verdict, we conclude that Plezia has failed to demonstrate that a rational jury could not find that he joined in a conspiracy with the goal of reducing Stern's reported taxable income in violation of § 371.

### ii. Scienter

Plezia also argues that the Government "failed to prove beyond a reasonable doubt that" Plezia knew that any funneled payments to Esquivel were non-deductible as illegal kickbacks under 26 U.S.C. § 162(c)(2). We are unpersuaded. Section 162 provides that no individual may deduct as a business expense any direct or indirect kickback payment prohibited by a "generally enforced" state law "subject[ing] the payor to criminal penalty *or the loss of a license or privilege to engage in a trade or business.*" *Id.* § 162(c)(2) (emphasis added). Based on our review of the record, the jury was presented with sufficient evidence supporting its conclusion that Plezia likely knew that the sums paid to him were not deductible under § 162.

Dillon, Plezia's accountant, testified that he thought that Plezia's checks to Esquivel's companies were business expenses. He further testified that if he had known that the sums that Plezia paid to Esquivel were for illegal case referral fees, he believed those sums should not have been reported as legal fee income from Stern *or* as an "advertising expense for the law firm"

provided by Esquivel. Several witnesses also testified that anyone could discern that a certain sum would be deducted from receiving a 1099 form that the issuer or payor could likely seek to deduct those sums paid as business expenses on their income tax forms.

Plezia alternatively argues that the Texas Penal Code § 38.12 and Rules 5.04 and 7.03 of the TDRPC are not "generally enforced" state laws that bar the deduction of kickback sums. This argument also fails. IRS regulations further explain that the "generally enforced" provisions of § 162(c)(2) sets out a presumption that a state law is generally enforced, but that presumption may be overcome "if it is never enforced or the only persons normally charged . . . are infamous or those whose violations are extraordinarily flagrant." 26 C.F.R. § 1.162-18(b)(3). Furthermore, the Supreme Court of Texas has made clear that an attorney who violates the TDRPC may be disbarred, have his license suspended, or be reprimanded under the bar's standard grievance procedure. *See In re Caballero*, 272 S.W.3d 595, 597 (Tex. 2008); *In re Lock*, 54 S.W.3d 305, 307 (Tex. 2001). The reviewing body for such grievances may be a district court or a disciplinary body within the bar. Tex. R. Disciplinary P. 2.13–.18; 3.09–.10; *In re Mercier*, 242 S.W.3d 46, 47 (Tex. 2007) (per curiam). As the Government notes, this dual enforcement system that carries penalties up to and including disbarment qualifies as a generally enforced state law that is enforced regardless of whether violations are "infamous or . . . extraordinarily flagrant." *See* 26 C.F.R. § 1.162-18(b)(3).

While Plezia and Watts testified for the defense that what Plezia did was immoral, but not routinely enforced by disbarment or jailtime, the jury also heard from Stern, Morris, Moncriff, both Stern's and Plezia's accountants, and Esquivel, who all testified to the fact that the relevant TDRPC and Texas Penal Code provisions carry the force of law. On appeal, Plezia points to no evidence, statistics, or prior cases that demonstrate that

the jury's decision to reject his evidence offered at trial resulted from unreasonable inferences to merit overturning the jury's verdict. *See United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014) (holding that the court must view the evidence and all reasonable inferences in the light most favorable to the jury's verdict). For these reasons, we hold that a rational jury could have found beyond a reasonable doubt that Plezia joined in a conspiracy with an object of unlawfully reducing reported taxable income for those involved in the scheme. *See id.*

### *iii. Variance Claim*

Plezia's last argument as to Count One is a variance claim challenging the sufficiency of the evidence supporting the jury's finding that Plezia and numerous other defendants were members of the same conspiracy. *See United States v. Fields*, 72 F.3d 1200, 1210 (5th Cir. 1996). Essentially, we are presented with the question of whether the evidence at trial was sufficient to demonstrate a single broad conspiracy "wheel" orchestrated by Stern as the "hub" and with Esquivel and Plezia as one "spoke." *See United States v. Richerson*, 833 F.2d 1147, 1152–53 (5th Cir. 1987). While "counting the number of conspiracies proved is a difficult exercise," this court has stated the relevant factors are "(1) the existence of a common goal, (2) the nature of the scheme[,] and (3) overlapping of participants in the various dealings." *Id.* at 1153 (citing *United States v. Tilton*, 610 F.2d 302, 307 (5th Cir. 1987)). We have further noted that the first criteria of a "common goal" is incredibly broad such that a "common goal is shown when the alleged co-conspirators all sought 'personal gains' through some participation in a broad conspiracy scheme." *United States v. Beacham*, 774 F.3d 267, 273 (5th Cir. 2014).

Here, there is ample evidence for the jury to reasonably infer that Plezia, Esquivel, and Stern "shared the common goal of deriving personal gain through" concealing illegal case runner payments. *See id.* at 273–74. As

to the second factor, we have said that a single conspiracy is inferred "where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture." *United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995). That element is arguably satisfied here as the jury could reasonably infer that the performance of one "spoke" of the "wheel," *i.e.*, Plezia's and Esquivel's successful, undetected funneling of case running payments, inured to Stern's benefit. The jury could also infer from the evidence that the scheme furthered the case running relationships that Stern had with other involved case runners and attorneys and netted more illicit tax-exempt income. Thus, the jury could reasonably conclude that the nature of the scheme here also indicates a single conspiracy. *See Beacham*, 774 F.3d at 274. The last factor also weighs in favor of supporting the jury's finding of a single conspiracy. We have stated that the overlap of participants factor carries "no requirement that every member must participate in every transaction to find a single conspiracy." *Morris*, 46 F.3d at 416. However, Plezia's argument that his lack of knowledge of the others involved in the case is insufficient to demonstrate that the jury irrationally found one broad conspiracy here. This is especially so in light of this court's consistent precedent that each member need not participate in every transaction in the conspiracy. *See United States v. Shows Urquidi*, 71 F.4th 357, 381–82 (5th Cir. 2023).[3]

Notably, Plezia did not request a multiple conspiracy jury instruction which would have explicitly directed the jury to acquit if they found that he was involved in a conspiracy other than the *conspiracy charged in the indictment*. *See Beacham*, 774 F.3d at 274. ("The district court instructed the

---

[3] The Government's theory, which the jury accepted here, has been approved as demonstrating a significant overlap, even where the participants work through a single "key man" or "hub" of the "wheel." *See Richerson*, 833 F.2d at 1154 (quotation omitted).

jury that if it found that a defendant was in a conspiracy but not in the conspiracy alleged in the indictment, then it must acquit."). We have consistently held that where a jury finds that a single conspiracy exists, we owe extreme deference to the jury's verdict. *See id.* Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was sufficient for the jury to find that Plezia knowingly participated in a single conspiracy to defraud the United States through the underreporting of income and concealment of illegal case running kickback payments.

### c. Evidence of Venue to Sustain Count Six

Plezia seeks to overturn his second 18 U.S.C. § 1001 conviction based on insufficient evidence that he made materially false statements while within the Southern District of Texas. Notably, the Government "need only show the propriety of venue by a preponderance of the evidence, not beyond a reasonable doubt." *United States v. Strain*, 396 F.3d 689, 692 & n.3 (5th Cir. 2005). A defendant "must assert a challenge to venue prior to trial if the indictment or circumstances known to the defendant make such a challenge apparent." *Rodriguez-Lopez*, 756 F.3d at 430 (citing *United States v. Carreon–Palacio*, 267 F.3d 381, 392 (5th Cir. 2001)). This court has also previously determined that "[i]f a venue challenge is not apparent before trial, a defendant must bring a claim of improper venue to the district court's attention at the close of the United States' evidence." *United States v. Rodriguez-Lopez*, 756 F.3d 422, 430 (5th Cir. 2014).

Here, the Government asserts that Plezia has waived his objection to venue because he did not raise the issue until after trial. We agree. *See United States v. Rodriguez-Lopez*, 756 F.3d 422, 430 (5th Cir. 2014) ("A defendant waives his right to contest venue on appeal, however, when his motion for acquittal fails to put the court and the United States on notice of the challenge to venue."). Although Plezia concedes that he did not raise the issue of venue

until after trial and that, under our circuit precedent, he has waived the challenge on appeal, he argues that our precedent is incorrect and that we should review his challenge under a plain error standard of review.

Assuming arguendo we were to apply a plain error standard of review to Plezia's venue challenge, his claim would still fail. For insufficient evidence of a venue element to rise to the level of plain error, there must have been a "manifest miscarriage of justice." *United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007). Plezia has not demonstrated a manifest miscarriage of justice here. 18 U.S.C. § 3237 provides that, except where prescribed by statute, "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be *inquired of and prosecuted* in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237. And as we have long held, "a jury may infer venue from circumstantial evidence in the record as a whole." *Id.* (citing *United States v. White*, 611 F.2d 531, 534–35 (5th Cir. 1980)).

In this case, all of Plezia's conduct occurred in Houston, Texas, and Simpson testified that he and Plezia met in person for their first interview at a coffee shop in Houston. Furthermore, Simpson worked out of the IRS's offices in Houston and all of his investigative work occurred within the Southern District of Texas. The jury was entitled to infer that Plezia had made the false statement while within the district from the evidence and testimony adduced at trial. *See id.* Based on this record, the jury reasonably concluded that Plezia was in the Southern District of Texas when the false statements about Plezia's BP litigation financing agreement with Stern were made during the September 28, 2018 phone interview. Thus, he cannot demonstrate a manifest miscarriage of justice meriting the reversal of his § 1001 conviction based on venue under even a plain error standard of review.

*d. Obstruction of a Federal Investigation in Count Seven*

No. 23-20483

Plezia further argues that his conviction for obstruction of a federal investigation under 18 U.S.C. § 1519 was supported by insufficient evidence. Because Plezia preserved this argument, we review the issue de novo. *See Brannan*, 98 F.4th at 638. He argues that the Government failed to satisfy its burden on the jurisdictional element of § 1519 because he submitted the alleged fabricated records used in support of his conviction at the request of the grand jury, which is not a federal agency or department contemplated by § 1519. In *United States v. McRae*, we described that § 1519 criminalizes three instances where a defendant acts with intent to obstruct any investigation—formal or informal—within the jurisdiction of a federal agency:

> (1) when a defendant acts directly with respect to the investigation or proper administration of any matter, that is, a pending matter, (2) when a defendant acts in contemplation of any such matter, and (3) when a defendant acts in relation to any such matter.

702 F.3d 806, 837 (5th Cir. 2012) (citations omitted). We have further held that to sustain a § 1519 conviction, the defendant need not know that the investigation is ongoing or even imminent. *See United States v. Moore*, 708 F.3d 639, 649 (5th Cir. 2013). Section 1519 provides that:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or *in relation to* or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519 (emphasis added). We have held that the clause "any matter within the jurisdiction of any department or agency of the United States"

25

prescribes a jurisdictional relationship "between the United States and the matter being obstructed." *McRae*, 702 F.3d at 835.

Previously, both the Supreme Court and this court have broadly interpreted the statutory language "in relation to" or "relating to" based on its common use. *See Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992); *United States v. Hubbard*, 480 F.3d 341, 347 (5th Cir. 2007) (citing *Morales*, 504 U.S. at 383). In *United States v. Moore*, 71 F.4th 392, 399 (5th Cir. 2023), the panel incorporated circuit and Supreme Court precedent to read 18 U.S.C. § 2251(a) as prohibiting the sexual exploitation of a minor, broadly. The *Moore* panel noted that the ordinary meaning of "relating to" means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Id.* at 400 (citations omitted) (cleaned up). In affirming the defendant's child exploitation conviction, the panel further stated that the phrase "relating to the sexual exploitation of children" is read in a broad sense to mean "any criminal sexual conduct involving children." *Id.* at 400.

Applying the ordinary meaning of the statute's "in relation to" clause here, we conclude that § 1519 criminalizes obstructive acts germane to or arising from a federal agency's investigation. We further hold that Plezia's submission of a false record to Simpson falls within § 1519's ambit because the grand jury's request did "pertain," "stand in some relation," or "have bearing or concern," to the IRS's investigation. *See id.* This conclusion accords with those of the Eighth and Eleventh Circuits, which have read § 1519's "in relation to" language in this manner and denied arguments that false records either produced at the request of the grand jury or discovered through the execution of a search warrant do not qualify as obstructive conduct under § 1519. *See United States v. Hoffman-Vaile*, 568 F.3d 1335, 1343 (11th Cir. 2009); *United States v. Yielding*, 657 F.3d 688, 710–14 (8th Cir.

2011). We hold that the jury properly found that Plezia obstructed a federal investigation in violation of 18 U.S.C. § 1519.

### e. Blumrosen's and Gerger's Testimony

A district court's decision to admit or reject evidence offered at trial is reviewed for abuse of discretion where appropriately preserved. *O'Malley v. U.S. Fidelity & Guar. Co.*, 776 F.2d 494, 500 (5th Cir. 1985). A misapplication of law generally constitutes an abuse of discretion. *See RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 859 (5th Cir. 2010). Where this court holds that the district court abused its discretion in its evidentiary ruling, the district court's determination will not be reversed unless the appellant identifies that the challenged ruling affected the appellant's substantial rights. *E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 763 (5th Cir. 2018).

Plezia contends that the district court abused its discretion by allowing Blumrosen and Gerger to read from their interview notes because the notes contained inadmissible hearsay. Even if the decisions to allow Gerger and Blumrosen to testify with the aid of their notes were error, it constitutes harmless error. The overwhelming amount of evidence outside of Gerger's and Blumrosen's testimony—spanning a fifteen-day trial—suggests that any error suffered was harmless. *See, e.g.*, *United States v. Judon*, 567 F.2d 1289, 1294–95 (5th Cir. 1978) (holding that a clear error to admit a document under Rule 803(5) would not require a new trial "because the proof of guilt on this case was so overwhelming that this latter evidentiary error would be harmless beyond a reasonable doubt"). This court has held that alleged evidentiary errors in such circumstances constitute harmless error where there is substantial evidence tending to prove guilt from a voluminous record. *See United States v. Greenlaw*, 84 F.4th 325, 352 (5th Cir. 2023); *United States v. Skilling*, 638 F.3d 480, 488 (5th Cir. 2011). Thus, we hold that the district

court's decisions to allow Gerger and Blumrosen to testify with the aid of their interview notes does not require overturning Plezia's convictions.

### III. Conclusion

For the foregoing reasons, we VACATE Plezia's judgment of conviction as to Count Five because the statute of limitations had run and remand with instructions to dismiss Count Five with prejudice. We AFFIRM Plezia's judgments of conviction as to all other Counts appealed.